## McGlinchey v. State Tax Equalization Board

*Robert C. Duffy,* for plaintiff.

*Harrington Adams,* Deputy Atty. General, and *Anne X. Alpern,* Atty. Gen'l, for Defendants.

HERMAN, J., August 22, 1960.—In this mandamus action, Herbert J. McGlinchey seeks to recover his salary for a period of two years and one month as a member of the State Tax Equalization Board. The

Commonwealth resists such payment. The matter is before us on a complaint, answer and hearing before the court without a jury, a jury trial having been waived.

McGlinchey was appointed a member of the State Tax Equalization Board on or about January 17, 1956, by the then Governor Leader, for a term to extend to November 14, 1959. He assumed his duties as a member of the board and continued to perform them until January 24, 1957.

On January 23, 1957, solely because a Federal grand jury had indicted him on a conspiracy charge not connected in any way with his office as a member of the Tax Equalization Board,[1] the Governor released to the press a draft of a letter addressed to McGlinchey in which it was stated:

"Inasmuch as a federal grand jury has found a true bill of indictment against you, I believe it proper for you to stand aside as a member of the State Tax Equalization Board.

"Accordingly, acting under the powers vested in me as Governor of the Commonwealth, *I hereby suspend you* from these duties, without pay, until the charges against you are decided in the court." (Italics supplied.)

It is not clear from the record whether McGlinchey received the *original* of the letter, but it is admitted by the Commonwealth that the draft was released to the newspapers and that the substance thereof is as herein quoted.

McGlinchey testified that about 5 or 6 p.m. that date, he heard on his car radio that he "had been fired by Governor Leader as a member of the Tax Equalization

---

[1] Although not a part of the record in this case, we can take notice of the fact that the charge was in connection with the construction of the $33,000,000 Tobyhanna Air Signal Corps Depot.

Board" and later that date, upon reading the newspapers, he found that he had been suspended, and still later he heard a commentator on television confirm the fact of his suspension.

This was the first notice he had of the Governor's action and he had no hearing of any kind, and prior to this time he had never been charged with misconduct.

The following day, January 24th, McGlinchey sent a telegram to the Governor stating substantially that the indictment against him was not well founded and would be proven false, and further that he was "taking a leave of absence *under protest*" so that he might devote all of his time and energy to defend "the vicious attack" on him and on his party.

On January 30, 1957, the Governor acknowledged this telegram, which he inadvertently called a letter, and purported to grant a leave of absence effective January 24, 1957, "until such time as the courts decide the indictment which has been lodged against you."

This is the way the matter stood until on February 23, 1959, McGlinchey was acquitted upon direction of the Federal court. On the very next day he was reinstated as a member of the State Tax Equalization Board, and at the time of the hearing in this court he was still such a member, although the time for which he had originally been appointed had expired.

The position of the Commonwealth is that he had requested and received a leave of absence and that, therefore, he is not entitled to his salary. McGlinchey, on the other hand, alleges that his request for leave was made under duress. Alternately, he alleges that the suspension by the Governor was done without cause and without an opportunity to be heard and was, therefore, invalid. He then concludes that he should be paid his salary.

We must first determine if this was a voluntary leave of absence, for if it was, then the Commonwealth's position is sound and the matter is at an end.

One cannot read the record in this case, however, without becoming convinced that, if indeed there was a "leave of absence" at all, it was not a voluntary one but was the result of compulsion or duress. McGlinchey's telegram to the Governor was sent *after* he had been advised by all the modern means of mass communication that he had been removed from his office. As far as he was concerned, his removal, whether temporary or permanent, was a fait accompli for the Governor had said "I hereby suspend you."

His telegram then was not a "request [for] a leave of absence from . . . [his] duties as Member of the State Tax Equalization Board" as the Governor indicated in his letter of January 30, 1957, when he attempted to grant such leave. It was rather a reluctant acceptance by McGlinchey of his release. He says, "I *am taking* a leave of absence" not "I *request* a leave of absence," and then he adds *"under protest."* "Under protest" of what? If he were asking for a leave of absence he would hardly do so under protest. The conclusion that we reach, that McGlinchey's telegram was merely an answer to and a reluctant acceptance of his chief's decision, is strengthened by his first sentence, in which he *replies* to the Governor that the indictment, on which the suspension was based, is political, and adds, "I assure you [it] will be met and proven to be absolutely false." (Italics supplied.)

All of his testimony, and it was uncontradicted, leads unmistakably to the conclusion that if McGlinchey was on leave of absence, then this leave was taken under duress. When on cross-examination he was asked what the duress consisted of, he replied:

"A. Well, being under trial and being accused unjustly by the Governor and *being fired* for something

I didn't do, I felt the bad publicity in the press was having some effect on my case before I went to the Federal Court, and the public would believe I was fired because this case had something to do with my indictment in the Federal Court.

"That was one of the reasons and, of course, the harassment of the press and newspaper men keeping calling me and my wife up under the condition she was, I felt the best thing to do if the Governor had already fired me or suspended me, I felt I didn't want any more of this publicity and having the press calling me everyday. And it had an effect on my condition if I had immediately gone on trial before the Federal Court." (Italics supplied.)

The modern view of duress is expressed in the Restatement of Contracts §492(a), where it is pointed out that duress means:

"(a) any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition, . . ."

We read, also, in 17A Am. Jur., Duress and Undue Influence, §7:

"There is no doubt that the early common-law doctrine of duress has gradually expanded and broken through its original limitations, with the result that many states have adopted the modern doctrine of 'business compulsion' or what is sometimes referred to as 'economic duress or compulsion'. This doctrine has been regarded by some of the courts as being different from duress, and in the sense that it is a relaxation of the early common-law rule this is true. Yet, broadly speaking, 'business compulsion' is a species of duress, not the common-law duress to be sure, but duress clothed in modern dress. It seems to be established as a general rule, at least in this country, that the payment of money or the making of a contract may be under such circumstances of business necessity or com-

pulsion as will render the same involuntary and entitle the party so coerced to recover the money paid, or excuse him from performing the contract."

See also Falgiatore v. Falgiatore, 378 Pa. 586 (1954), and Fountain v. Bigham, 235 Pa. 35 (1912).

While such duress cannot be predicated on a demand or an act which is lawful, it has been held that if such act or demand is wrongful in the *moral* sense, though not criminal or tortious or in violation of contractual duty, such act or demand may also constitute duress by business compulsion. See Fowler v. Mumford, 48 Del. 282, 102 A. 2d 535; Restatement of Contracts, §492, comment (*g*).

In 17A Am. Jur., Duress and Undue Influence, §7, it is said further that:

"The doctrine of 'business compulsion' or 'economic duress' has been applied in a wide variety of circumstances. . . . A threat to cause a person loss of employment may amount to duress."

And at section 11:

"Thus, a threat of personal or family disgrace may be of such gravity as to deprive the one threatened of the mental capacity necessary to execute a valid contract. Also, a threat to unlawfully interfere with one's employment may constitute duress."

See also Tri-State Roofing Company of Uniontown v. Simon, 187 Pa. Superior Ct. 17 (1958).

We do not rest our decision, however, on the question of a leave of absence under duress. As we view the entire situation, we reach the conclusion that McGlinchey was separated from his office by the Governor contrary to law, and since he has now been reinstated, the only matter before us is the question of his salary for the 25 months he was improperly suspended. We conclude that mandamus will lie and the salary should be paid to him.

The State Tax Equalization Board is an independent administrative board of which each member is appointed by the Governor for a four-year term: June 27, 1947, P. L. 1046, 72 PS §4656.1 and §4656.2. It is further provided in 72 PS §4656.2(*b*), in part, that "A member of the board may, *after notice and an opportunity to be heard*, be removed *for cause* by the Governor." (Italics supplied.)

It has been firmly established by our appellate courts that although article VI, sec. 4, of the Constitution of 1874 provides that "Appointed officers . . . may be removed at the pleasure of the power by which they shall have been appointed"[2] nevertheless:

". . . where the legislature creates a public office, it may impose such terms and limitations with reference to the tenure or removal of an incumbent as it sees fit. There is nothing in the Constitution prohibiting such action while, on the other hand, Article XII, Section 1, expressly admits of it. Of course, where the legislature, in creating a public office, imposes no terms or limitations on the duration of an incumbent's tenure or the mode of his removal, the method of removal prescribed by Article VI, Section 4, of the Constitution applies": Watson v. Pennsylvania Turnpike Commission, 386 Pa. 117 (1956).

---

[2] Article VI, sec. 4 of the Constitution of 1874 in its entirety provides:

"All officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime. Appointed officers, other than judges of the courts of record and the Superintendent of Public Instruction, may be removed at the pleasure of the power by which they shall have been appointed. All officers elected by the people, except Governor, Lieutenant Governor, members of the General Assembly and judges of the courts of record learned in the law, shall be removed by the Governor for reasonable cause, after due notice and full hearing, on the address of two-thirds of the Senate."

See also Milford Township Supervisors' Removal, 291 Pa. 46 (1927); Weiss v. Ziegler, 327 Pa. 100 (1937); Marshall Impeachment Case, 360 Pa. 304 (1948).

In the Watson case the court found an implied limitation on the method of removal by virtue of the fact that any appointment to fill a vacancy was to be made for the balance of the term, and further that the legislature had provided that the terms of the Turnpike Commission should be fixed and staggered. The court then found that article VI, sec. 4, of the Constitution did not apply and that the Governor could not remove a commissioner "at his pleasure" but only for cause. In the instant case, the legislature has created the office and has specifically provided that the Governor may remove *"for cause"* and then only *"after notice and an opportunity to be heard."* (Italics supplied.)

In the case of McSorley v. Pennsylvania Turnpike Commission, 390 Pa. 81 (1957), true bills of indictment had been found against McSorley and Torrance, Pennsylvania Turnpike Commissioners, for offenses directly connected with their office. The Governor addressed letters of suspension to these commissioners, which letters appear to have been identical with the one addressed to McGlinchey. Each commissioner, there, immediately sought through mandamus to retain his office and to continue to receive the emoluments thereof and relied almost entirely on the Watson case. The court pointed out that in the Watson case it was held only that the Governor could not remove a commissioner *at his pleasure* but that a removal or suspension for cause was an entirely different matter, and, finding that the Governor could remove for cause, said that "The power of the Governor to *remove* an appointee *for cause* embraces the power to *suspend for cause*; the greater implies the less." (Italics supplied.)

The same court then further pointed out, at page 88:

"In any instance where cause is the basis for the Governor's action, whether it be removal or suspension that is indicated, it must depend upon the seriousness of the justification for the action. While no inference of guilt is to be drawn from the mere fact of the indictments against the plaintiffs, who will remain clothed with a presumption of innocence until their guilt is established, nevertheless the indictments do furnish probable cause for the Governor's belief that the plaintiffs have been guilty of wrongdoing in their offices which is sufficient to constitute just cause for suspending them from the duties of their offices until the charges against them are decided in the courts."

We need not here pass upon the question of whether the Governor had cause to suspend McGlinchey when he did; but McGlinchey having been found not guilty on the criminal charge (which was the only basis for the Governor's action), and having been immediately, upon acquittal, returned to office, we think it naturally follows that the suspension without notice and without an opportunity to be heard has now been shown to have been unlawful and that McGlinchey is entitled to the emoluments of his office for the period during which he was suspended.

For the reasons given in this opinion we enter the following:

*Order*

And now, August 22, 1960, unless exceptions to this order are filed within 30 days hereof, judgment shall be entered for plaintiff and against the several defendants. The said State Tax Equalization Board, John Bevac, Chairman, and Frank K. Cochran, member, shall be ordered and directed to certify to the Auditor General and the State Treasurer so much of the salary of plaintiff from January 24, 1957, to February 24,

1959, as a member of said board as remains unpaid; Charles C. Smith, the Auditor General, shall be ordered and directed to cause warrants to be drawn for the payment of said salary and Robert F. Kent, the State Treasurer, shall be ordered and directed to cause said salary to be paid; the costs of these proceedings to be borne by defendants.